[L. A. No. 18870. In Bank. May 24, 1946.]

EDITH M. CROUCH, Appellant, v. BEN E. CROUCH
Respondent.

244

Charles C. Montgomery, Jr., for Appellant.

Peters & Peters for Respondent.

EDMONDS, J.—In a suit for divorce and for a share of the community property, the wife's causes of action were held to be barred by a final decree of divorce rendered in favor of her husband in the State of Nevada. But the court found, as a fact, that at no time while the husband was in Nevada did he have any intention of becoming a resident of that state except for the purpose of obtaining a divorce, and the question for decision concerns the effect of the foreign decree under such circumstances.

The appeal is upon the judgment roll. In the complaint filed by Edith M. Crouch in March, 1942, she alleged that the separation between herself and her husband Ben E. Crouch, occurred in 1938; that he deserted her and is now living in this state. She also pleaded a cause of action upon the ground of cruelty, one upon the ground of adultery, and another in which she asserted that he had failed to provide for her. Mrs. Crouch also sought to enjoin the defendants from disposing of any community property in which she had any interest. Within a month before the complaint was filed, she alleged, her husband went to Nevada, "simulating a purported residence" there for the purpose of obtaining a divorce. She prayed for a divorce, an accounting of the community property, alimony, and attorney's fees. By answer the husband denied all of the wife's charges and pleaded as a defense to each cause of action that at the time of the filing of her complaint he was, and for some time prior thereto had been, a resident of Nevada where on May 4, 1942, he had obtained a decree of divorce from her.

Upon the issues framed by these pleadings the court found that each of the appellant's causes of action is barred by the decree of divorce obtained by Crouch in Nevada. But the court also found that at the time when Crouch filed his complaint and at the time of the rendition of judgment, he was not a bona fide resident of Nevada but a resident of California. Crouch entered Nevada, the findings continue, "solely for the purpose of obtaining a divorce from the plaintiff

herein [and] . . . in so doing . . . [he abandoned his wife] without cause.'' He remained in Nevada ''just long enough to obtain an apparent residence'' there and then filed his action for divorce, obtained the decree in his favor, and returned to California. And, continued the trial court, ''. . . at no time while defendant was in the state of Nevada did he have any intention of becoming a resident thereof save and except for the sole purpose of obtaining a divorce from this plaintiff.'' According to the findings, in the Nevada action there was ''constructive service'' upon Mrs. Crouch. At the trial of the present suit, her counsel admitted that there was no community property and the cause of action for a part of it was abandoned. By the determination that the decree of divorce obtained by Crouch in Nevada bars the present action, there was no occasion for a finding concerning alimony, but, so far as the record shows, Mrs. Crouch is continuing to assert her right to support.

The Nevada decree recites that ''the defendant . . . [was] personally served with summons in the City of Glendale, County of Los Angeles, State of California,'' and, contrary to the trial court's finding, that ''the plaintiff is a *bona fide* resident of the County of Washoe, State of Nevada.'' However, the findings of each court state that Mrs. Crouch did not appear in the Nevada action.

Under the findings of fact of the trial court, says the appellant, the decisions of the Supreme Court of the United States do not compel a holding that the divorce decree obtained in Nevada bars the present action in California. The principles laid down by that court, Mrs. Crouch asserts, have no effect upon the rule of decision in this state that the judgment of a sister state may be collaterally attacked for extrinsic fraud. In support of the determination in his favor, Crouch declares that, as Mrs. Crouch was personally served with a copy of the complaint and of the summons in the foreign action, the courts of California must give full faith and credit to the Nevada decree and are required to recognize it as controlling the rights of the parties in the present litigation.

In *Williams* v. *North Carolina*, 317 U.S. 287 [63 S.Ct. 207, 87 L.Ed. 279, 143 A.L.R. 1273], the defendants were convicted of bigamy in the state court. At the time they went to Nevada to obtain divorces from their respective spouses, they were residents of North Carolina. After satisfying the residence requirement under the Nevada statute, each of them

obtained a divorce. They were married in Nevada shortly after the divorces were granted and then returned to North Carolina where they lived together as husband and wife. There they were indicted for bigamy and found guilty by a jury. The state Supreme Court sustained the convictions. (*State* v. *Williams*, 220 N.C. 445 [17 S.E.2d 769].)

The judgments of conviction were reversed by the Supreme Court of the United States, which overruled *Haddock* v. *Haddock*, 201 U.S. 562 [26 S.Ct. 525, 50 L.Ed. 867]. If either spouse is domiciled in a state where a divorce is granted upon constructive service, the court held, the divorce must be recognized in other states. But it was careful to point out that the decision did not apply to a situation such as that shown by the record now before this court, saying: ''In the first place, we repeat that in this case we must assume that petitioners had a *bona fide* domicil in Nevada, not that the Nevada domicil was a sham. We thus have no question on the present record whether a divorce decree granted by the courts of one state to a resident, as distinguished from a domiciliary, is entitled to full faith and credit in another state. Nor do we reach here the question as to the power of North Carolina to refuse full faith and credit to Nevada divorce decrees because, contrary to the findings of the Nevada court, North Carolina finds that no *bona fide* domicil was acquired in Nevada.'' (317 U.S. 302.) The decision consistently has been applied in accordance with this reservation. (See: *Williams* v. *North Carolina*, 325 U.S. 226 [65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366]; *Marshall* v. *Marshall*, 69 Cal.App.2d 20 [157 P.2d 854]; *Davis* v. *Davis*, ——Ohio App.—— [57 N.E.2d 703]; *Wilkes* v. *Wilkes*, 245 Ala. 54 [16 So.2d 15]; *Atkins* v. *Atkins*, 386 Ill. 345 [54 N.E.2d 488]; *Wolff* v. *Wolff*, 134 N.J.Eq. 8 [34 A.2d 150]; *Melnick* v. *Melnick*, 154 Pa. Super.Ct. 481 [36 A.2d 235]; *Koscove* v. *Koscove* (1945), 113 Colo. 317 [156 P.2d 696]; *Kraunz* v. *Kraunz*, 51 N.Y.S.2d 433; *Coe* v. *Coe* (1944), 316 Mass. 423 [55 N.E.2d 702]; *Bowditch* v. *Bowditch*, 314 Mass. 410 [50 N.E.2d 65]; *Commonwealth ex rel. Esenwein* v. *Esenwein*, 348 Pa. 455 [35 A.2d 335]; see cases cited in 157 A.L.R. 1399, supplementing annotation in 143 A.L.R. 1294.)

In a second case arising out of the same divorces (*Williams* v. *North Carolina*, 325 U.S. 226 [65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366]), the question was directly raised whether a Nevada decree must be given full faith and credit when North

Carolina found that no *bona fide* domicil had been established in Nevada. The court ruled that a judgment of one state must be given full faith and credit in another state only if the court that rendered the original judgment had jurisdiction to do so; that North Carolina's determination that the libellants did not establish a bona fide domicil in Nevada sufficient to give its courts jurisdiction to render a divorce decree was warranted by the evidence; and that, under such circumstances, North Carolina was not bound to give full faith and credit to the Nevada decree. The judgments of conviction were affirmed.

In *Esenwein* v. *Pennsylvania,* 325 U.S. 279 [65 S.Ct. 1118, 89 L.Ed. 1608, 157 A.L.R. 1396], William F. Esenwein sought relief from an order requiring him to support May H. Esenwein, whom he had married some years before. Twice the petitioner had sought a divorce in Pennsylvania and each time failed to obtain a dissolution of his marriage. Later he went to Nevada and obtained a divorce after the minimum six weeks residence period. Shortly thereafter he left Nevada and became a resident of Ohio.

Petitioner then filed an application in Pennsylvania for relief from the support order. The application was denied upon the ground that petitioner did not have a bona fide domicil in Nevada when he obtained his decree of divorce. (348 Pa. 455 [35 A.2d 335].) The United States Supreme Court, upon certiorari, affirmed the judgment, declaring that the state courts "were warranted in finding that the respondent sustained her burden of impeaching the foundation of the Nevada decree on the jurisdictional prerequisite of *bona fide* domicil." (*Esenwein* v. *Pennsylvania,* 325 U.S. 279 [65 S.Ct. 1118, 1119, 89 L.Ed. 1608, 157 A.L.R. 1396].)

Neither the second Williams case, *supra,* nor the Esenwein case, *supra,* necessarily controls the determination of the present controversy. Although these cases hold that one state need not give full faith and credit to a divorce decree rendered by a state which has neither jurisdiction of the parties nor subject matter, they do not decide that one state may not, if it wishes, recognize as valid a decree of another state. However, the decisions are significant for they point out, not only that a state has the "right collaterally to impeach a decree of divorce made in another state, by proof that the court had no jurisdiction, even when the record purports to show jurisdiction" and that "jurisdiction . . . is founded

on domicil," but also that if the findings of domicil by one state were conclusive in the state from which the successful litigant came, "the policy of each State in matters of most intimate concern could be subverted by the policy of every other State." (*Williams* v. *North Carolina*, 325 U.S. 226 [65 S.Ct. 1092, pp. 1095, 1096, 89 L.Ed. 1577, 157 A.L.R. 1366].)

 It is a well established rule that jurisdiction to grant a divorce rests upon bona fide domicil. Where neither party is domiciled within the state, no divorce can validly be granted and all proceedings, as well as the judgment, are void.

 Stated another way, a decree of divorce rendered in one state may be impeached and denied recognition in another upon the ground that neither of the parties had domicil at the divorce forum, and this is true notwithstanding the recital in the decree from the other state of the jurisdictional fact of domicil or residence. (See: Beale, Conflict of Laws, vol. 1, §§ 74.3, 111.1 and cases cited therein; Goodrich, Conflict of Laws (2d ed.) § 123; Rest., Conflict of Lawe, § 111; 9 Cal.Jur. 815, 817.) This principle has been recognized by the United States Supreme Court in recent decisions (*Williams* v. *North Carolina*, 325 U.S. 226 [65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366]; *Esenwein* v. *Pennsylvania, supra*), and has been consistently followed by courts of other states. (*Reed* v. *State* (1945), —— Tex.Crim.R. —— [187 S.W.2d 660]; *Atkins* v. *Atkins, supra*; *Davis* v. *Davis, supra*; *Wilkes* v. *Wilkes, supra*; *Wolff* v. *Wolff, supra*; *Melnick* v. *Melnick, supra*; *Koscove* v. *Koscove, supra*; *Usen* v. *Usen*, 136 Me. 480 [13 A.2d 738, 128 A.L.R. 1449]; *Howe* v. *Howe*, 179 Va. 111 [18 S.E.2d 294]; *Adams* v. *Adams*, 191 Ga. 537 [13 S.E.2d 173]; *Wright* v. *Wright* (1942), 350 Mo. 325 [165 S.W.2d 870]; *Ainscow* v. *Alexander* (1944), —— Del. —— [39 A.2d 54]; *Navarrette* v. *Joseph Laughlin, Inc.* (1944, La.App.), 20 So.2d 313; *Coe* v. *Coe* (1944), 316 Mass. 423 [55 N.E.2d 702]; *Re Lindgren,* 293 N.Y. 18 [55 N.E.2d 849, 153 A.L.R. 936]; *Commonwealth ex rel. Esenwein* v. *Esenwein,* 348 Pa. 455 [35 A.2d 335]; *Noffsinger* v. *Noffsinger* (1943, D.C.Dist.Col.), 50 F.Supp. 810; and for a more complete list of cases see 157 A.L.R. 1399 supplementing annotation in 143 A.L.R. 1294.)

 The rule of decision long followed in this state is that when a foreign divorce decree is relied upon, and the record shows compliance with the foreign law, a presumption of valid-

ity arises and, in the absence of a successful attack upon the ground that the foreign court had no jurisdiction, the foreign decree will be recognized here. ▮ However, by an equally well settled corollary of the rule, it is always competent to collaterally impeach a decree of divorce rendered in another state by extrinsic evidence showing that the court pronouncing it did not have jurisdiction either of the parties or the subject matter. Thus the decree may always be attacked upon the ground that the foreign court had no jurisdiction because the petitioning party had not established a bona fide domicil. (*Kadello* v. *Kadello,* 220 Cal. 1 [29 P.2d 171]; *Delanoy* v. *Delanoy,* 216 Cal. 27 [13 P.2d 719]; *Estate of Pusey,* 180 Cal. 368 [181 P. 648]; *Estate of Pusey,* 177 Cal. 367 [170 P. 846]; *Bruguiere* v. *Bruguiere,* 172 Cal. 199 [155 P. 988, Ann. Cas. 1917E, 122]; *Estate of Hancock,* 156 Cal. 804 [106 P. 58, 134 Am.St.Rep. 177]; *In re James,* 99 Cal. 374 [33 P. 1122, 27 Am.St.Rep. 60]; *Marshall* v. *Marshall,* 69 Cal.App. 2d 20 [157 P.2d 854]; *Brill* v. *Brill,* 38 Cal.App.2d 741 [102 P.2d 534]; *Estate of Davis,* 38 Cal.App.2d 579 [101 P.2d 761, 102 P.2d 545]; *Estate of McNutt,* 36 Cal.App.2d 542 [98 P.2d 253]; *Estate of Bruneman,* 32 Cal.App.2d 606 [90 P.2d 323]; *DuQuesnay* v. *Henderson,* 24 Cal.App.2d 11 [74 P.2d 294]; *Wynne* v. *Wynne,* 20 Cal.App.2d 131 [66 P.2d 467]; *Kegley* v. *Kegley,* 16 Cal.App.2d 216 [60 P.2d 482]; *People* v. *Harlow,* 9 Cal.App.2d 643 [50 P.2d 1052]; *Ryder* v. *Ryder,* 2 Cal. App.2d 426 [37 P.2d 1069]; *Warren* v. *Warren,* 127 Cal.App. 231 [15 P.2d 556]; *Broder* v. *Broder,* 122 Cal.App. 296 [10 P.2d 182]; *Anthony* v. *Tarpley,* 45 Cal.App. 72 [187 P. 779]; *Steinbroner* v. *Steinbroner,* 30 Cal.App. 673 [159 P. 235]; *In re Culp,* 2 Cal.App. 70 [83 P. 89].) ▮ A decree based upon either personal or constructive service or even a personal appearance may be attacked upon this ground. (*Rehfuss* v. *Rehfuss,* 169 Cal. 86 [145 P. 1020]; *Brill* v. *Brill, supra; Estate of Davis, supra; Estate of McNutt, supra; Estate of Bruneman, supra; Kegley* v. *Kegley, supra; Ryder* v. *Ryder, supra; Anthony* v. *Tarpley, supra;* see: *Roberts* v. *Roberts,* 83 Cal.App. 345 [256 P. 826]; Goodrich, Conflict of Laws (2d ed.) § 123, and cases cited therein; Beale, Conflict of Laws, vol. 1, § 111.1.)

▮ Section 1916 of the Code of Civil Procedure provides: "Any judicial record may be impeached by evidence of a want of jurisdiction in the court or judicial officer, of collusion between the parties, or of fraud in the party offering the

record, in respect to the proceedings." Civil Code, section 90, provides: "Marriage is dissolved only: One—By the death of one of the parties; or, Two—By the judgment of a court of competent jurisdiction decreeing a divorce of the parties." In view of these code provisions, once it is established that the court of a sister state or foreign country was without jurisdiction to render a valid decree of divorce, the courts of this state are precluded from recognizing as valid a dissolution of marriage based upon such a judgment. (See: *People* v. *Harlow, supra,* p. 646, and *In re Culp, supra,* p. 81.)

A state undoubtedly has a constitutional right to declare and maintain a policy in regard to marriage and divorce or any other family relationship, at least as to persons domiciled within its borders. And to hold that every divorce decree must be recognized as valid here because our social state generally recognizes divorce and the legality of remarriage would be to disregard our own marital policy as established by the Legislature. Also, the state is vitally concerned with the welfare of the deserted wife or children within its borders, and the fact that a spouse is unwilling or unable to travel across the country to dispute the issue of jurisdiction, or that no one is in a position to protest before the foreign decree is entered, or that a recital of jurisdiction is contained in the decree should not be, of itself, a certificate of legal correctness for what has been done. (*Delanoy* v. *Delanoy, supra,* p. 35; *Rehfuss* v. *Rehfuss, supra,* p. 92; *Kegley* v. *Kegley, supra,* p. 221; *Howe* v. *Howe, supra,* p. 118; *Usen* v. *Usen, supra;* see: Powell, *And Repent at Leisure,* 58 Harv.L.Rev. 930; *Williams* v. *North Carolina,* 325 U.S. 226 [65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366]; Radin, *The Authenticated Full Faith and Credit Clause,* 39 Ill.L.Rev. 1; Rodman, *Bases of Divorce Jurisdiction,* 39 Ill.L.Rev. 343; Goodrich, Conflict of Laws (2d ed.) § 123; Beale, Conflict of Laws, vol. 1, § 110.1.)

By the preliminary recitals of the findings of fact, it appears that after the court "heard testimony" and "examined proofs offered by the plaintiff," on its own motion it "refused to hear further evidence." What this further evidence was or by whom it was offered is not shown by the record. However, in his brief, the respondent states that he was called as a witness and testified for the appellant under the provisions of section 2055 of the Code of Civil Procedure. During his examination, it is said, upon the introduction in evidence of the final decree of divorce rendered in Nevada, the court

''halted the trial'' and decided that the determination in the prior action was decisive of the issues presented by Mrs. Crouch's complaint.

 The basis for the ruling upon the introduction of further evidence is made clear by the court's decision. It concluded, as a matter of law, that even if the respondent's domicil in Nevada was not bona fide, the decree of divorce entered in that state is a bar to the present action. As the appeal is upon the judgment roll alone, in conformity with the general rule, it will be presumed that the finding as to the respondent's lack of good faith in establishing a Nevada domicil is supported by the evidence. If he was not given an opportunity to present evidence in addition to his own testimony as an adverse witness, the ruling was not prejudicial for the judgment was in his favor. In the event of another trial, unquestionably the court will receive such admissible evidence as may be offered by each of the parties upon the issue of the bona fides of the respondent's Nevada domicil.

The judgment is reversed.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

SCHAUER, J.—I dissent from the majority opinion and judgment insofar as concerns the discussion and holding as to the lack of finality of the Nevada decree in respect to the marital status of the parties, and am of the view that the judgment should be affirmed insofar as it determines the status of the parties to be as adjudicated in Nevada, but I believe that such part, and such part only, of the judgment as forthwith denies plaintiff any support from defendant should be reversed and remanded to the trial court for a new trial solely on the issue of plaintiff's right, if any, to support from defendant.

I view as unsound in principle and obnoxious to our social order the proposition, today espoused by a majority of this court, that California shall accord substantially no faith or credit to the judgment of the court of a sister state admittedly valid therein. The federal Constitution still contains the language of section 1, article IV. That the proposition may be limited to a judgment determining marital status does not make the vice inconsequential. As acknowledged by the majority opinion, the decision of the Supreme Court in *Williams*

v. *North Carolina* (1945), 325 U.S. 226 [65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366] (the second Williams case), does not compel such a commitment. The choice is made by us. I should much prefer to see California heed the philosophy and follow the views expressed by Justices Rutledge and Black (Justice Black's opinion is concurred in by Justice Douglas) in their dissenting opinions in the mentioned case. Such dissenting opinions seem to me to emblazon their conclusion with clarity of thought and language and integrity of principle which are outstanding among all discussions of the subject. And, remarkably enough, they simply urge that a clear constitutional mandate be upheld. The application of their views to the case at hand appears from the facts hereinafter recited and from the portions of the opinions quoted.

The judgment roll in the case before us shows that the plaintiff was personally served, in California, with the summons in the earlier Nevada action and that the Nevada court found as a fact "that the plaintiff [defendant in this action] is a bona fide resident of the County of Washoe, State of Nevada." There is no finding that the Nevada court was the victim of fraud or that the evidence before that court did not as a matter of law support the finding it made. If the Nevada decree were shown to be invalid *under Nevada law* we should have an entirely different situation. But that is not the case. The Nevada court's findings and judgment remain unimpaired and fully operative in the State of Nevada and the California court in this case has expressly adjudicated "That the final decree of divorce obtained by the defendant . . . from the plaintiff . . . in . . . the State of Nevada . . . is valid." The court here has simply assumed to relitigate between the same parties, one of the identical issues which was litigated in the Nevada court; i. e., the issue of residence or domicile of a party. And such relitigation is indulged in not to determine whether the residence of the party in Nevada was bona fide within the concept of Nevada law and social policy but whether such residence in Nevada was bona fide in Nevada within the concept of a California judge and California's laws and policy. The mere incident that the California court reached a different determination upon such evidence as it received (whether the same or different) touching the issue of fact as to domicile wholly fails to solve the constitutional question and certainly not the social problem. The Nevada court, within the concept of that court and that state's law

and social policy, had jurisdiction of the cause and over the party who submitted his status to its adjudication. The defendant there (plaintiff here) was not denied due process.

It seems to me that, as suggested by Justice Douglas in his concurring opinion in the Esenwein case (*Esenwein* v. *Pennsylvania* (1945), 325 U.S. 279 [65 S.Ct. 1118, 1119, 89 L.Ed. 1608, 157 A.L.R. 1396]), there is a "basic difference between the problem of marital capacity and the problem of support" and that in an action for monetary support a plaintiff *upon that theory* and under certain circumstances could recover from a defendant who had procured a decree in another state. Thus, we are confronted with two problems in this case: (1) we must squarely face the question of the quantum of faith and credit, if any, to be accorded an adjudication of marital status made by the court of, and fully valid in, another state; (2) we must decide what, if any, rights to support exist in favor of a former spouse of one who has severed the marital ties by a divorce secured in another state.

## THE MARITAL STATUS

In connection with the first problem—that of marital status —we must consider, denuded of confusing qualifications, the stark question as to whether California shall accord full faith and credit to the Nevada judgment, fully valid in that state, or shall reexamine and retry the basic factual issue of domicile. That issue, the majority opinion holds, shall be retried in California not to determine whether the standard concept of domicile acceptable to Nevada, and upon which she has full authority to accord state citizenship rights, was established, but whether a concept ordained for Nevada by California (in the estimation of the trier of fact), as to citizens moving to Nevada from other states, was shown in Nevada. And furthermore, the majority hold, the question to be tried is not whether the evidence presented to the Nevada court was sufficient or insufficient as a matter of law to sustain the finding it made, nor whether there was fraud upon the Nevada court, extrinsic or intrinsic (the record here reveals no extrinsic fraud), but the proceeding here is simply a trial de novo between the same parties, upon the same cause—their marital status—in a different jurisdiction which has a different standard or concept of legal residence.

The holding in this case may also result in nullifying, in many cases, the effect of section 63 of the Civil Code of California, which provides that "All marriages contracted with-

out this state, which would be valid by the laws of the country in which the same were contracted are valid in this state." This section has been upheld and applied by this court. (*McDonald* v. *McDonald* (1936), 6 Cal.2d 457, 459 [58 P.2d 163, 104 A.L.R. 1290].) The defendant in this case, who is legally divorced in Nevada, could contract a valid marriage in that state. If he brought his Nevada wife to California, would the majority of this court hold that he had two legal wives in California? Or would they refuse to apply section 63 and hold him guilty of bigamy? What would be the status in California of his children born of the Nevada marriage? These are questions which adherence to the constitutional mandate would preclude from arising or would answer but which the majority holding tends to engender.

Our social state generally recognizes divorce and the legality of remarriage. It is reported that there are approximately five million divorced persons scattered throughout the forty-eight states. It seems to me that if the status of those persons is to be kept socially tolerable it should be accorded a high degree of stability and be legally ascertainable by a rule of law, applicable alike in all states to all persons within the class, rather than determinable by individual whimsy of judge or jury in each state in a conclusion based on indirect evidence as to a subjective fact.

It is said that domicile depends upon intent. Only the possessor of the intent can give direct evidence of it. It is essentially intangible. Once fixed it may perdure for the full span of a life or it may shift and reshift as quickly as sequent thoughts. The one may be no less real than the other. Neither is susceptible of conclusive proof hence, courts accept what we term legal proof. Aside from the direct testimony of the party, circumstantial evidence—such as physical presence in a locality, ownership of land, etc.—is the only means of legal proof. Legal proof acceptable to Nevada was established by the defendant here in his Nevada action.

Section 1, amendment XIV, of the United States Constitution declares that "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States *and of the State wherein they reside.*" (Italics added.) No definition of the word "reside" is provided. No law has been suggested as precluding Nevada from extending state citizenship rights to any United States citizen who meets her requirements, nor as precluding any

such person from claiming and exercising such rights. It is not disputed that Nevada's residence requirements for divorce, so far as physical presence within the state for the prescribed time are concerned, were met by the defendant. And the Nevada court, upon competent evidence, in a proceeding not even suggested to be vitiated by extrinsic fraud, found that defendant entertained the required intent. It should not lie within the power of a court of another state, under such circumstances, to relitigate that nebulous question which in its very nature can frequently, if not always, be open to conflicting inferences but never to conclusive proof. The majority holding means that no person divorced in another jurisdiction (apparently whether in a default or contested proceeding) can be certain of his status in California until the issue of domicile has been relitigated here. The majority opinion does not purport to limit its ruling to California citizens who undertake to establish residence in Nevada; it appears to base its holding on a finding of the fact trier that in his estimation defendant was not a legal resident of Nevada. And if the rule is sound as to a Nevada divorce it must be equally applicable to a divorce granted in any other state or country. Whether the residence requirement of a state be one month or five years can make no difference. The physical residence requirement may be fully met, as it was here, yet that nebulous question of intent can always be retried. The obnoxious consequences to the social order of such a rule are self-evident.

The masterful protests of Justices Rutledge and Black as voiced in their dissenting opinions in *Williams* v. *North Carolina* (1945), *supra*, 65 S.Ct. 1092, 1101 and 1109, obviously do not possess the power of law today but they enunciate realistic principles of reason and philosophy which we may hope will prevail when the time comes that the nation or the states will relieve our divorced citizens from the intolerable uncertainties of their present status and solve the problems which seem to me to be created and left unanswered by the majority opinion in that case and which recur, in one form, in this case.

Mr. Justice Rutledge in dissenting says (p. 1101 of 65 S.Ct.): ''Once again the ghost of 'unitary domicil' returns on its perpetual round, in the guise of 'jurisdictional fact,' to upset judgments, marriages, divorces, undermine the relations founded upon them, and make this Court the unwilling

and uncertain arbiter between the concededly valid laws and decrees of sister states. From Bell and Andrews to Davis to Haddock to Williams and now back to Haddock and Davis through Williams again—is the maze the Court has travelled in a domiciliary wilderness, only to come out with no settled constitutional policy where one is needed most. . . .

". . . Were all judgments given the same infirmity, the full faith and credit clause would be only a dead constitutional letter. . . .

"I.

"What, exactly are the effects of the decision? The Court is careful not to say that Nevada's judgment is not valid in Nevada. To repeat, the Court could not so declare it, unless a different test applies to sustain that judgment than supports North Carolina's. Presumably the same standard applies to both; and each state accordingly is free to follow its own policy, wherever the evidence, whether the same or different, permits conflicting inferences of domicil, as it always does when the question becomes important. . . .

". . . [P. 1103 of 65 S.Ct.] Every divorce, wherever granted, whether upon a residence of six weeks, six months or six years, may now be re-examined by every other state, upon the same or different evidence, to redetermine the 'jurisdictional fact,' always the ultimate conclusion of 'domicil.' . . . [A]ny decree, granted after any length of time, upon any ground for divorce, and however solid the proof, may be re-examined either by 'the state of domiciliary origin' or by any other state, as the case uncertainly may be. And all that is needed, to disregard it, is *some* evidence from which a jury reasonably may conclude there was no domiciliary intent when the decree was rendered. . . .

"II.

". . . [P. 1106 of 65 S. Ct.] By every test remaining effective, and not disputed, Nevada had power to alter the petitioner's marital status. She made the alteration. If it is valid, neither North Carolina [nor California] nor we are free to qualify it by saying it shall not be effective there, while it is effective in Nevada, and stands without impeachment for ineffectiveness there. . . .

". . . It is exactly for the situation where state policies differ that the clause and the legislation were intended. With-

out such differences, the need for constitutional limitation was hardly one of magnitude. . . .

## "III

"[P. 1107 of 65 S.Ct.] Domicil, as a substantive concept, steadily reflects neither a policy of permanence nor one of transiency. It rather reflects both inconstantly. The very name gives forth the idea of home with all its ancient associations of permanence. But 'home' in the modern world is often a trailer or a tourist camp. Automobiles, nation-wide business and multiple family dwelling units have deprived the institution, though not the idea, of its former general fixation to soil and locality. But, beyond this, 'home' in the domiciliary sense can be changed in the twinkling of an eye, the time it takes a man to make up his mind to remain where he is when he is away from home. He need do no more than decide, by a flash or thought, to stay 'either permanently or for an indefinite or unlimited length of time.' No other connection of permanence is required. All of his belongings, his business, his family, his established interests and intimate relations may remain where they have always been. Yet if he is but physically present elsewhere, without even bag or baggage, and undergoes the mental flash, in a moment he has created a new domicil though hardly a new home.

"Domicil thus combines the essentially contradictory elements of permanence and instantaneous change. No legal conception, save possibly 'jurisdiction,' of which it is an elusive substratum, affords such possibilities for uncertain application. The only thing certain about it, beyond its uncertainty, is that one must travel to change his domicil. But he may travel without changing it, even remain for a lifetime in his new place of abode without doing so. Apart from the necessity for travel, hardly evidentiary of stabilized relationship in a transient age, the criterion comes down to a purely subjective mental state, related to remaining for a length of time never yet defined with clarity. . . .

"[P. 1109 of 65 S.Ct.] I therefore dissent from the judgment which, in my opinion, has permitted North Carolina at her substantially unfettered will to deny all faith and credit to the Nevada decree, without in any way impeaching or attempting to impeach that judgment's constitutional validity. But if she is not to be required thus to give the faith and credit due, in my opinion she should not be allowed to deny

it by any standard of proof which is less than generally is required to overturn or disregard a judgment upon direct attack. Cf. *Schneiderman* v. *United States,* 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796. The solemnity of the judicial act and the very minimum of 'respect' due the action of a sister state should compel adherence to this standard, though doing so would not give the *full* faith and credit which the Constitution commands. To approximate the constitutional policy would be better than to nullify it."

Mr. Justice Black, with whom Mr. Justice Douglas concurs, says (p. 1109 of 65 S.Ct.) : "Statistics indicate that approximately five million divorced persons are scattered throughout the forty-eight states. More than 85% of these divorces were granted in uncontested proceedings. Not one of this latter group can now retain any feeling of security in his divorce decree. Ever present will be the danger of criminal prosecution and harassment.

"All these decrees were granted by state courts. *Erie R. Co.* v. *Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, and cases following it, recognized the obvious truth, that rules of law laid down by state courts are binding. These judicial 'laws' are represented by decrees, judgments and court opinions. Today's opinion, however, undermines and makes uncertain the validity of every uncontested divorce decree. It wipes out every semblance of their finality and decisiveness. It achieves what the Court terms the 'desirable effect' of providing the 'same' quality to *every* divorce decree, 'wherever the question arises'—it endows them all alike with the 'same' instability and precariousness. The result is to classify divorced persons in a distinctive and invidious category. A year ago, a majority of this Court in a workmen's compensation case declared that the Full Faith and Credit Clause of the Constitution was a 'nationally unifying force'; today, as to divorce decrees, that clause . . . has become a nationally disruptive force. Uncontested divorce decrees are thus so degraded that a person who marries in reliance upon them can be sent to jail. . . .

"[P. 1111 of 65 S.Ct.] The petitioners were married in Nevada. North Carolina has sentenced them to prison for living together as husband and wife in North Carolina. This Court today affirms those sentences without a determination that the Nevada marriage was invalid under that State's laws. This holding can be supported, if at all, only on one of two

grounds: (1) North Carolina has extra-territorial power to regulate marriages within Nevada's territorial boundaries, or (2) North Carolina can punish people who live together in that state as husband and wife even though they have been validly married in Nevada. A holding based on either of these two grounds encroaches upon the general principle recognized by this Court that a marriage validly consummated under one state's laws is valid in every other state. If the Court is today abandoning that principle, it takes away from the states a large part of their hitherto plenary control over the institution of marriage. A further consequence is to subject people to criminal prosecutions for adultery and bigamy merely because they exercise their constitutional right to pass from a state in which they were validly married into another state which refuses to recognize their marriage. Such a consequence runs counter to the basic guarantees of our federal union. *Edwards* v. *California*, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119. . . .

'' [P. 1112 of 65 S.Ct.] The Court permits North Carolina to disregard the decrees on the following line of reasoning. No state need give full faith and credit to a 'void' decree. A decree rendered by a court without 'jurisdiction' is 'void.' No state court has 'jurisdiction' to grant a divorce unless one of the parties is 'domiciled' in the state. The North Carolina court has decided that these petitioners had no 'domicile' in Nevada. Therefore, the Nevada court had no 'jurisdiction,' the decrees are 'void,' and North Carolina need not give them faith or credit. . . .

'' [P. 1113 of 65 S.Ct.] The Constitution provides that 'Full Faith and Credit shall be given in each State to the Public Acts, Records, and Judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records, and Proceedings shall be proved, and the *Effect thereof*.' (Emphasis added.) Acting pursuant to this constitutional authority, Congress in 1790 declared what law should govern and what 'Effect' should be given the judgments of state courts. That statute is still the law. Its command is that they 'shall have such faith and credit given to them . . . as they have by law or usage in the courts of the State from which they are taken.' 28 U.S.C. 687, 28 U.S.C.A. § 687. If, as the Court today implies, divorce decrees should be given less effect than other court judgments, Congress alone has the constitutional power to say so. We

should not attempt to solve the 'divorce problem' by constitutional interpretation. At least, until Congress has commanded a different 'Effect' for divorces granted on a short sojourn within a state, we should stay our hands. A proper respect for the Constitution and the Congress would seem to me to require that we leave this problem where the Constitution did. If we follow that course North Carolina cannot be permitted to disregard the Nevada decrees without passing upon the 'faith and credit' which Nevada itself would give to them under its own 'law or usage.' . . . No 'law or usage' of Nevada has been pointed out to us which would indicate that Nevada would, under any circumstances, consider its decrees so 'void' as to warrant imprisoning those who have remarried in reliance upon such existing and unannulled decrees. . . .

". . . [P. 1117 of 65 S.Ct.] [T]he Court's unjustifiable devitalization of the Full Faith and Credit Clause and the Act passed pursuant to it creates a situation which makes the North Carolina statute [and that of California and all similar statutes of other states] an inescapable trap for any person who places the slightest reliance on another state's divorce decree—a situation which a proper interpretation of the federal question would avoid. . . .

"[P. 1118 of 65 S.Ct.] In earlier times, some Rulers placed their criminal laws where the common man could not see them, in order that he might be entrapped into their violation. Others imposed standards of conduct impossible of achievement to the end that those obnoxious to the ruling powers might be convicted under the forms of law. No one of them ever provided a more certain entrapment, than a statute which prescribes a penitentiary punishment for nothing more than a layman's failure to prophesy what a judge or jury will do. This Court's decision of a federal question today does just that." And the decision of the majority in this court today in California does just that.

### THE RIGHT TO SUPPORT

In this state it is declared by statute that "Husband and wife contract towards each other obligations of mutual respect, fidelity, and *support*." (Civ. Code, § 155; italics added.) In addition, a thing in action (i. e., a right of action against another) is personal property (Civ. Code, § 14), and, as this court observed in *Ponsonby* v. *Sacramento Suburban Fruit*

*Lands Co.* (1930), 210 Cal. 229, 282 [291 P. 167], "The term [property] is a generic one. . . . When unqualified the term is sufficiently comprehensive to include every species of estate, both real and personal, whether choate or inchoate [citations], whether corporeal or incorporeal [citations]. The word is sometimes used in the sense of 'estate.' . . ." Further with respect to property it is stated in 50 Corpus Juris, pages 736-738, that "Generally, the subjects of property comprise all valuable rights or interests protected by law. . . . In the broad sense of the term, 'property' includes . . . choses in action. . . . In modern legal systems, property includes practically all valuable rights. The term is indicative and descriptive of every possible interest which a person can have, extends to every species of valuable right or interest, and comprises a vast variety of rights. The right to be protected in a person's privileges belonging to him as an individual or secured to him as a member of the commonwealth is property, as is any valuable interest in or to any object of value that a person may lawfully acquire or hold." (Cited in *Scott* v. *McPheeters* (1939), 33 Cal.App.2d 629, 632 [92 P.2d 678, 93 P.2d 562].)

It is elementary constitutional law that a court of one state cannot render a personal judgment against one who is a nonresident and who has not been personally served within the state or appeared in the action, nor can such court cut off the property rights, existing without the state, of such nonresident. (See 5 Cal.Jur. § 223, pp. 873-874; 14 Cal.Jur. § 6, pp. 860-862; 42 Am.Jur. §§ 67, 73-87, pp. 56, 62-76.) And yet that is exactly the effect which the judgment of the trial court herein would accord to the Nevada divorce decree secured by defendant. Although plaintiff in her complaint pleads four separate causes of action for support as well as for divorce against defendant, the trial court made no findings as to the truth or merit of any of them, but simply found "that each of them are barred by" defendant's Nevada decree. It seems to me that regardless of the efficacy, or lack thereof, of such decree to fix the marital status of the parties, plaintiff is entitled to an adjudication by the courts of this state in accordance with our laws as to any right of support she may have had against defendant as of the date of, and preceding, the Nevada decree. (See concurring opinion in *De Young* v. *De Young* (1946), 27 Cal.2d 521, 527 [165 P.2d 457].) If, regardless of the Nevada decree, the court finds that plaintiff is entitled to such support, then it should be awarded to her.

Public policy would also, it appears, be supported by such a procedure. Although, as indicated hereinabove, it is my view that it is in the interests of such policy that a decree of divorce rendered under the circumstances here shown be accorded full faith and credit in every state of the union insofar as concerns *marital status,* it seems equally apparent that public policy would likewise be served by refusing to recognize such decree (in a proceeding not having personal jurisdiction over the defendant therein) as cutting off the right to support which then and theretofore existed in favor of a resident of this state. This state has itself assumed a duty of support towards indigent persons and has, in order to relieve itself of certain of the burdens incident to the granting of relief, undertaken to enforce support from those who by law are made responsible for such persons. (Welf. & Inst. Code, §§ 2400-2615.) To permit the courts of another state to cut off that responsibility by means of constructive service of process in an action against a resident of California would seem to me to be both unconstitutional insofar as concerns the rights of such resident, and contrary to the public policy and interests of this state.

It is, therefore, my opinion that regardless of the determination made concerning the effect of the Nevada decree upon the marital status of the parties, plaintiff is entitled to have the merits of her claimed right of support from defendant litigated by California courts.

It should be noted, in conclusion, that the findings of the trial court in this case state as follows: "and the court having heard testimony and having examined proofs offered by the plaintiff; and the court *on its own motion having refused to hear further evidence;* and the court being fully advised in the premises now makes its Findings of Fact as follows: . . ." (Italics added.) Then appears the finding, among others, that "defendant herein was not a bona fide resident of the State of Nevada" when he sought and secured the Nevada divorce decree. It appears to me that under such circumstances; i.e., where the judgment roll establishes that the trial court denied defendant an opportunity to present evidence in his own behalf, we should not indulge the presumption that the finding against defendant on the issue of his Nevada residence was supported by the evidence. (See *O'Connell* v. *Behan* (1912), 19 Cal.App. 111, 118 [124 P. 1038].) Nevertheless, it is in reliance upon such presumption and such finding that the ma-

jority opinion bases its reversal of the trial court's judgment.

For the reasons above stated the judgment should be affirmed insofar as concerns the marital status of the parties but that portion, and that portion only, of the judgment which denies plaintiff support from defendant should be reversed and the cause, as to such issue only, remanded to the trial court for a new trial.

Carter, J., concurred.